## E. W. Stubbs, Appellant, v. City of Aurora et al., Appellees.

### Gen. No. 5441.

1. LOCAL IMPROVEMENTS—*effect of records of board where award of contract questioned.* In a proceeding to enjoin the award of a contract for a local improvement upon the ground that the board is about to let such contract to one other than the lowest bidder, while the board is bound by its own records yet such records do not bar the right to show that the board in awarding the contract acted fraudulently or from unlawful or improper motives, but in passing upon the action taken by the board its members are to be judged not by what the proofs may show the facts to be but by the situation as it then honestly appeared to them.

2. LOCAL IMPROVEMENTS—*power of board to reject lowest bid.* If after an honest and careful investigation the board of local improvements is convinced that it is not for the public good to award the contract under consideration to the lowest bidder, it has full power to reject such bid.

3. LOCAL IMPROVEMENTS—*term "responsible bidder" defined.* The term "responsible bidder" includes more than mere financial responsibility, comprehending as well ability to discharge the obligations of the proposed contract in accordance with what might be expected and demanded thereunder.

4. MANDAMUS—*when relief will not be awarded.* Neither in equity nor at law in mandamus will the court in the absence of fraud interfere with the exercise of the discretionary power vested in a board of local improvements.

5. CHANCERY—*when will not grant relief to taxpayer.* Chancery will not extend relief to a taxpayer when it is shown that the action is not brought in good faith for the protection of his own interests but that he is merely a colorable plaintiff suing in behalf of other parties in interest.

6. DISMISSAL—*when proper in chancery.* When it appears that the real complainant is suing for the benefit of another who would have no standing a dismissal should be awarded in chancery notwithstanding an otherwise meritorious cause of action.

Bill in equity. Appeal from the Circuit Court of Kane county; the Hon. DUANE J. CARNES, Judge, presiding. Heard in this court at the October term, 1910. Affirmed. Opinion filed March 16, 1911.

SEARS & SOLFISBURG and GANN, PEAKS & TOWNLEY, for appellant.

CHARLES F. CLYNE and J. C. MURPHY, for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

Sections 77 and 78 of the Act of 1907, concerning Local Improvements, are in part as follows:

"Sec. 77.  Said board of local improvements may reject any and all proposals or bids, should they deem it best for the public good; and if they shall be of the opinion that a combination exists between contractors, either to limit the number of bidders or to increase the contract price, and that the lowest bid is made in pursuance thereof it shall be their duty to do so; and said board may reject the bid of any party who has been delinquent or unfaithful in any former contract with the municipality, and shall reject all proposals or bids other than the lowest regular proposal or bid of any responsible bidder, and may award the contract for said work or improvement to the lowest responsible bidder at the prices named in his bid, which award shall be recorded in the record of its proceedings.  Such award, if any, shall be made within twenty days after the time fixed for receiving bids.  If no award be made within said time, another advertisement for proposals or bids for the performance of the work, as in the first instance, shall be made, and thereafter (the board shall) proceed in the manner above in this act provided; and such readvertisement shall be deemed a rejection of all former bids,  *  *  *

"Sec. 78.  Any owner or person interested in any of the property assessed and any bidder shall be entitled to a hearing before said board on any question connected with any such award."

The city of Aurora acting under this statute, adopted two ordinances, one for improving State street within certain boundaries with asphalt pavement and combined curb and gutter, and the other for the like improvement of North avenue within certain boundaries. The Board of Local Improvements advertised for and received bids for said improvements.  For the improving of State street the Standard Paving Company,

hereinafter called the Standard Company, bid $14,873.98, and the McCarthy Improvement Company, hereinafter called the McCarthy Company, bid $15,563.39. For the improvement of North avenue, the Standard Company bid $17,625.18 and the McCarthy Company bid $18,039.26. In other words the Standard Company bid $689.40 below the McCarthy Company on State street and $414.08 on North avenue. The bids were received at a meeting of the board held on June 6, 1910, and the record of the board shows that it adjourned for consideration and investigation of bids, to convene at the call of the president. The record of the board shows it next held a meeting on June 8, at which representatives of the Standard Company were present and made arguments showing why the Standard Company should be awarded these contracts. The meeting then adjourned to June 9. The record of the meeting of June 9 shows that a petition was presented from property owners on State street, representing 430 feet in excess of a majority of the frontage, and a petition from property owners on North avenue representing 270 feet in excess of a majority of the frontage, which petitions requested the board to award the contracts to the McCarthy Company rather than to the Standard Company; and that two attorneys appeared representing the Standard Company, one of whom claimed to also represent some 200 feet of property on State street and some 1,200 feet of property on North avenue, and protested against the letting of the contracts to other than the lowest bidder; and that the meeting adjourned subject to the call of the president. The record of the board shows that on June 10, the board unanimously adopted a resolution letting each of these contracts to the McCarthy Company. The resolution as to State street was as follows:

"RESOLVED, that we, the Board of Local Improvements, find the McCarthy Improvement Company to

be the lowest responsible bidder for the improvement of the roadway on State Street, between Benton Street and Claim Street, in accordance with an ordinance numbered 1155, passed by the City Council of the City of Aurora, February 21st, A. D. 1910, and approved February 23rd, 1910. We further find that it is for the best public good that the proposal of the Standard Paving Company, for said improvement, be rejected. BE IT FURTHER RESOLVED, That the contract for constructing said improvement be and it is hereby awarded to said McCarthy Improvement Company, at the prices named in its bid therefor, and that notice of this award be published for two days in the Aurora Daily Beacon, a daily newspaper published and circulated in the city of Aurora.''

The resolution as to North Avenue was in similar terms.

On June 22, 1910, a bill in equity in the name of E. W. Stubbs was filed against the city and its officers and the Board of Local Improvements and the McCarthy Company to enjoin the letting of the contract for the improvement of State street to the McCarthy Company. On July 28, 1910, an amended bill was filed in said cause. It alleged that Stubbs was a citizen and taxpayer of the city of Aurora and the owner of 149 feet frontage on State street within the limits of said improvement; alleged the adoption of the said ordinance as to State street, the advertising for bids, the bids of the Standard Company and of the McCarthy Company; charged that the Standard Company was solvent and responsible and that its agents had the requisite skill to construct an asphalt pavement in accordance with said ordinance and that it intended to do the work with materials of the best quality and of the kind specified in the ordinance, if it obtained the contract; that it offered to prove to the board its ability to perform the contract; that the board at one of said meetings announced that it was satisfied that the Standard Company was responsible and had the necessary skill to do the work and that the ma-

terials with which it proposed to do the work were of the best quality and conformed to the specifications; but that the board, unlawfully intending to favor the McCarthy Company at the expense of the property owners, awarded the contract to the McCarthy Company at its bid; that the board announced as a reason for said award that if the contract was awarded to the Standard Company, it intended to purchase asphalt for said pavement from the Barber Asphalt Paving Company, which the board denominated the "Paving Trust;" that the board actuated solely by prejudice against said Barber Company, announced that it would not permit any materials contributed or sold by the Barber Company to be used on the streets of Aurora, and that this decision by the Board did not purport to be based on any belief that such materials were inferior or did not conform to the specifications, but the board admitted that such materials did conform to the specifications and were of the best quality. The bill alleged that the asphalt sold by the Barber Company was the particular asphalt referred to in the ordinance and its specifications. The bill also alleged that the board did not in good faith determine that the McCarthy Company was the lowest responsible bidder, but the award to it was wholly arbitrary and was actuated solely by prejudice against the Barber Company and a desire to favor the McCarthy Company as against the Standard Company. The prayer was that the city and the McCarthy Company be enjoined from entering into such contract; that the McCarthy Company be enjoined from making the improvement; that the city engineer, city collector, and city treasurer be enjoined from certifying and paying the McCarthy Company for the work; and that all further proceedings under the award be enjoined. On the same day that the amended bill was filed, each of the defendants answered, in which answer among other things the allegations of the amended bill as to the motives gov-

erning the board in awarding the contract to the Mc-
Carthy Company were fully denied. The answer al-
leged that the board fully investigated all matters in
connection with the awarding of the contract; that the
board investigated as fully as its members were able
to do the character, standing and financial responsi-
bility of the two bidders, the character of the work
which each had theretofore done and the promptness
with which it had been done, and the opinion of the
people of the city and of the abutting property owners
who were to pay for the improvement; that they made
their investigations honestly, fairly and conscien-
tiously, without any desire unjustly to favor either bid-
der, but with the sole object of best serving the people
of the city and those owning property along the line
of the improvement. The answer further alleged that
although, during said investigation, they became in-
formed that the Standard Company bought its asphalt
from the Barber Company and that the latter was a
part of the paving trust and that the awarding of the
contract to the Standard Company would cause the use
of the trust product, yet said facts were not the things
which controlled the board in awarding the contract,
but were only some of many minor circumstances con-
sidered by the board. The answer alleged that the
board awarded the contract to the McCarthy Company
after a complete investigation of all the facts and cir-
cumstances and acted upon the best judgment of each
member of the board, without any feelings of favorit-
ism or hostility to each bidder; that the board deemed
it for the best public good that the bid of the Standard
Company be rejected, and that the board was of opin-
ion that the bid of the McCarthy Company was the
lowest responsible bid. The answer also alleged that
after making said award the board entered into a con-
tract with the McCarthy Company for the construc-
tion of said improvement and that said contract is in
full force.

On the same day that this original bill was filed Louis Joubert, the owner of a lot fronting on North avenue within the limits of the improvement on that street, also filed a bill to enjoin the letting of the contract to the McCarthy Company for the improvement of North avenue. On the same day in which the amended bill and answer thereto in the Stubbs case were filed, both cases were tried together before the chancellor, and he found the equities with the defendants in the Stubbs case and dismissed that bill for want of equity, and this is an appeal by Stubbs therefrom. Counsel state that a like decree was entered in the Joubert case, but it has not been appealed. Joubert and Stubbs were witnesses, and the evidence of both is in the record before us, but, it having been stipulated that all the testimony referred to both cases except that of the complainants, the appellant did not insert the evidence of Joubert in his abstract and appellees have embodied it in an additional abstract.

Appellees contend that the action of a municipal body like the board of local improvements can only be shown by its record, and that, as the record here made shows that the board found that the McCarthy Company was the lowest responsible bidder and that it was for the public good that the bid of the Standard Company be rejected, that conclusion cannot be disputed by oral testimony. While the board is no doubt bound by its own records and the rule contended for is applicable in a proper case, we are of opinion that if the board acted fraudulently or from unlawful and improper motives, it could not screen itself from judicial investigation by any record which it might prepare. The rule contended for would enable any municipality to bar all investigation into its fraudulent and unlawful acts.

In passing upon this action by the board its members are to be judged, not by what the proofs may show the facts to be, but by the situation as it then honestly appeared to them. They caused Dun or Brad-

street to be examined, and found that the capital stock of the Standard Company was only $20,000 while the aggregate of its bids on these two improvements was about $32,500. It found that the capital stock of the McCarthy Company was much larger. The Standard Company have never done any work in the city of Aurora. The McCarthy Company had done much work there. They were informed that in other places the work of the Standard Company had not been satisfactory. The work of the McCarthy Company in Aurora had been very satisfactory. A number of circumstances combined to cause them to believe, and they undoubtedly did believe, that the Barber Company was back of the Standard Company or else that this was really the bid of the Barber Company. At the time of making a previous street improvement in Aurora, one Ellis, as an agent of the Barber Company, had visited Aurora, had approached the members of the board in a way which caused them to distrust his motives, had obtained all the necessary details for preparing a bid, had stated that the Barber Company would bid, and then the Barber Company did not bid but instead a bid was made by the Standard Company. Before the bids were received for the improvements now in question, Ellis had again visited Aurora and had professed to be acting for the Standard Company. At the first meeting of the board on these improvements when representatives of the Standard Company were present at the meeting, the members of the board inquired about Ellis and were told by the representatives of the Standard Company there present that they knew nothing about Ellis and that he did not represent the Standard Company. At the second meeting of the board they again made inquiries about the relations between Ellis and the Standard Company or the Barber Company, and the representatives of the Standard Company exhibited much displeasure at the inquiry. The members of the board had learned that the work of the Barber Company else-

where had not been satisfactory, and that its work was done very slowly and that other municipalities had had difficulty with the Barber Company under contracts let to it for street improvements. They learned from these representatives of the Standard Company that said company was buying its materials from the Barber Company. At the trial of this case it was testified that the Standard Company bought about one-half of its materials from the Barber Company, but also that at that time they were buying all their asphalt from the Barber Company. The work done by the McCarthy Company in Aurora had been done rapidly so that the cross streets and the individual lots were only blocked for a short space of time. It is clear that the commissioners believed that if the asphalt trust, through the Barber Company or the Standard Company, obtained a foothold in Aurora and drove out the local competition of the McCarthy Company, which latter had its principal office in that county, the cost of future improvements would be materially increased. They took pains to ascertain the sentiment of the citizens and especially of the owners of the property along the line of the two improvements. They found the general sentiment was in favor of letting the contract to the McCarthy Company, although its figures were slightly higher than those of the non-resident Standard Company. The owners of a majority of the frontage on each of the streets petitioned the board to let the contract to the McCarthy Company. The paper which one of the attorneys for the Standard Company presented at the meeting on June 9 showed six or seven signatures of State street owners and one or two signatures of North avenue owners. Each member of the board testified that he did not act through favoritism to the McCarthy Company nor because the Standard Company was believed to be a member of the asphalt trust, but because he believed that the McCarthy Company was the more responsible bidder and because he believed it was for the public good that the contract

should be let to the McCarthy Company rather than
to the Standard Company. We are constrained to be-
lieve from the evidence that the members intended to
discharge their duty faithfully and to act for the pub-
lic good and that it honestly appeared to them at the
time that the public would be much better served by
rejecting the bid of the Standard Company and by
letting the contract to the McCarthy Company. They
had full power under the statute above quoted to re-
ject the bid of the Standard Company, if they honestly
believed that such action was for the public good. We
cannot say that they were guilty of fraud or favoritism
in rejecting the bid of the Standard Company.

When we have determined that the court below was
warranted in finding from the evidence that the mem-
bers of the board of local improvements were not
guilty of fraud, we have substantially disposed of the
authority of a court of equity to interfere in this case.
It is worthy of note that most of the cases relied upon
by appellant were actions of *mandamus;* but even in
*mandamus,* the court has no power to interfere with
the discretion reposed by law in such a body, in the
absence of fraud. In People v. Kent, 160 Ill. 655, the
bid of the Barber Company was accepted, although it
was $3,536 higher than that of another asphalt com-
pany. It was there held that the term ''responsible
bidder'' in a similar statute included more than mere
financial responsibility and, in such a case, included
the ability to discharge the obligations of the proposed
contract in accordance with what might be expected
or demanded thereunder, for, otherwise, the giving of
a bond for the performance of the contract would make
every bidder a responsible bidder. It was there said:
''It appears that the defendant, after investigating
the records made by the relator in doing similar work
before, and the other matters referred to in his an-
swer, determined that the relator was not the lowest
responsible bidder. He was vested with the exercise

of official judgment and discretion, with which, in the absence of fraud, courts have no right to interfere. (Kelly v. City of Chicago, 62 Ill. 279; People ex rel. v. Dental Examiners, 110 Ill. 180; People ex rel. v. Mayor, 25 Wend. 680; People ex rel. v. Council of Troy, 78 N. Y. 33.) In this case there was neither favoritism nor fraud as a matter of fact, and none is to be inferred as a matter of law.'' Johnson v. Sanitary District, 163 Ill. 285, was a suit in equity, where the Sanitary District had rejected the lowest bidder and had let the contract to one who bid over $145,000 more, and the bill sought a mandatory injunction to compel the awarding of the contract to the complainants, who were the lowest bidders and who were also taxpayers and legal voters of the District. The court said: ''The board having reserved to itself the right to pass upon the evidence of the pecuniary resources and ability to do the work, and being, under the act, vested with the power to determine the lowest responsible bidder, it is by the act made the judge to determine the qualifications of the bidders. When the statute vests a discretion in a municipal body to determine a question, it is not the province of the courts to determine and control that discretion. The mandatory injunction applied for to compel the letting of the contract to appellants is in the nature of a *mandamus*, and is an attempt to control a discretion that is judicial in its nature. The duty of examining the proposals, determining the responsibility and awarding the contract is judicial in its nature and character, and the awarding the contract is a judicial act, which is not within the province of the courts to control by *mandamus* or mandatory injunction. (East River Gas Light Co. v. Donnelly, 93 N. Y. 55; People ex rel. v. Gleason, 121 N. Y. 631; Erving v. Mayor, 131 N. Y. 133; State ex rel. v. McGrath, 91 Mo. 386; State ex rel. v. Shelby Co., 36 Ohio 326; Douglas v. Commonwealth, ex rel., 108 Pa. St. 559; Hoole v. Kinkead, 16 Nev. 217.) Nor can the courts, in the absence of fraud, restrain

the trustees from entering into such contract as they may award to the bidder.''

In Kelly v. City of Chicago, 62 Ill. 279, the lowest bidder refused to take the contract. The board of public works rejected the next lowest bidder and awarded the contract to a party bidding $4,218 higher, and the court refused to interfere with the discretion of the board, no fraud being shown.

But if, under the statute, this board, after rejecting the bid of the Standard Company, should have re-advertised for bids, still another reason appears why the court properly dismissed this bill. Stubbs was called as a witness to prove that he owned property abutting upon the State street improvement and that he signed the bill and amended bill. The description of his property in the bill shows that he owns a frontage of 149 feet. The State street improvement was about a mile long and there was frontage on both sides of the street. The exact amount by which his assessment would be increased by the acceptance of the bid of the McCarthy Company instead of the Standard Company is not shown, but if the benefits to and assessment against his lot averaged with the other lots abutting on the improvement, the increase in his assessment would apparently be less than $10. The slightness of his financial interest caused his cross-examiner to inquire how he came to bring this suit. Stubbs was a man of education and intelligence, and he sought to maintain the position that he had instituted the suit, but the reading of his entire evidence in the record shows that an attorney of the Standard Company got permission to use his name as the complainant in this suit in order, as he understood it, to compel the letting of the contract to the Standard Company upon the promise to him that the suit should cost him nothing. Though he read the bill or had it read, it is clear that he had no adequate understanding of the legal effect of the suit. That this litigation is conducted, not by taxpayers but by the Standard Company, was made

still more evident by the testimony of Joubert, who was not as intelligent as Stubbs, and from whose entire examination, read at large in the record, it is made entirely manifest that these are not suits by taxpayers, brought by them in good faith for their own benefit, but that they permitted the use of their names upon a promise that the litigation should cost them nothing; and in Joubert's case, it is evident that he expects some compensation or favor for permission to use his name. Appellant earnestly insists that we should not consider the evidence of Joubert because of the stipulation that the testimony refers to both cases, except the testimony of complainants; but appellants called Joubert as a witness, and put his testimony in their certificate of evidence, and it is a part of what was before the court below, and we do not doubt the propriety of considering it in determining who is the real complainant litigating these cases. From all the evidence there can be no doubt that the Standard Company is the real party complainant, and that no suits would have been instigated except for its promise to pay the costs and furnish the attorneys. Equity will not extend relief to a taxpayer when it is shown that the action is not brought in good faith for the protection of his own interests, but that he is merely a colorable plaintiff suing in behalf of other parties in interest. 2 High on Injunctions, 4th Ed., sec. 1302; Commissioners v. Deboe, 43 Ill. App. 25. In the case entitled *In re* Burdick, 162 Ill. 48, it is held that while a collusive suit is pending the court will, at the suggestion of a party to the record or of a person in interest who may be prejudiced by the judgment, or of an *amicus curiae*, or upon its own motion, dismiss the suit out of court. In People v. General Electric Railway Company, 172 Ill. 129, it was held that one who cannot maintain a bill for an injunction will not be allowed to accomplish his purpose indirectly or by an information in chancery in the name of the attorney-

general, and that equity may go behind the nominal parties to the record in a proceeding for an injunction to discover the real parties in interest. To the same effect is Watson v. Le Grand Roller Skating Rink Company, 177 Ill. 203. It is not contended by appellant that the Standard Company could have maintained this suit in equity in its own name, and several of the authorities above cited show indirectly that it could not. Under certain circumstances a taxpayer could maintain such a suit. When the court below discovered that the Standard Company was the real actor in this suit, brought under cover of a taxpayer whom it had induced to permit the use of his name by a promise to the taxpayer that it should be without expense to him, it was proper for the court to dismiss the suit, even if fraud by appellees had been shown.

The decree is therefore affirmed.

*Affirmed.*